ISBELL-PORTER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7305. Promulgated June 14, 1928.

*Charles D. Hamel, Esq.,* and *Lee I. Park, Esq.,* for the petitioner. *Robert A. Littleton, Esq.,* for the respondent.

626

**OPINION.**

LITTLETON: Petitioner first contends that it is a corporate continuation of Smith & Sayre Manufacturing Co. and that there should be

restored to its invested capital an amount of $270,000, representing cash and stock paid by Smith & Sayre Manufacturing Co. for certain patents. That is, that in determining its invested capital we should allow to it the same invested capital that would have been allowable to the Smith & Sayre Manufacturing Co., and that in so doing, there should be added to invested capital the cost of certain patents acquired by that company but which were not entered on petitioner's books in 1890 when the assets then owned by Smith & Sayre Manufacturing Co. were transferred to petitioner. The respondent denies that the petitioner is a corporate continuity of Smith & Sayre Manufacturing Co., and that the cost of assets to that company is a basis for determining the invested capital of the petitioner. The respondent also offered evidence with respect to a reorganization in connection with a receivership of petitioner in 1903 and 1904 for the purpose of showing that the petitioner's invested capital should be computed on the basis of a corporation beginning at that time. No proof was offered by petitioner with respect to the value of assets in 1903 and 1904, and little proof with respect to the value in 1890.

In view of the nature of the assets on account of which the restoration is asked, we find it unnecessary to pass on the questions raised with respect to corporate changes in 1890 and in 1903 and 1904. Petitioner asks to have included in its invested capital the cost of patents issued from 1855 to 1887. We held in *Union Metal Manufacturing Co.*, 1 B. T. A. 395, that " patents are by nature exhaustible," and that while " it may be true that the exercise of a monopoly, under a patent, may tend to build up a good will increasing in value as rapidly or more rapidly than the patent is exhausted, exhaustion of a patent can not be offset by appreciation in a different asset, good will." We further said in the same opinion that " the *benefits* derived under a patent may in effect be prolonged by the issuance of new patents, just as the benefits of a lease may be prolonged by new leases—but after the expiration of the original patent, as after the expiration of th , the benefits and values are not attributable to it ones." See also *Winsor & Jerauld Manufacturing Co . T. A. 22.

While it may be true that the cash amount equal to the value of assets once paid in may not be reduced for invested capital purposes, it can not be understood from this that any asset once paid in, whether for cash or stock, will always remain on the taxpayer's books, without taking into consideration, in the case of depreciable or exhaustible assets, the depreciation or exhaustion occurring over the life of the assets. Ordinarily, the depreciation or exhaustion taking place is accounted for on the taxpayer's books by a charge against earnings of the depreciation or exhaustion sustained in a given year

and a credit to a depreciation or exhaustion reserve of the same amount, so that at the end of the life of the asset the reserve would equal the cost of the asset. Where the asset account is carried at cost, the reserve would not be a proper item to be included in invested capital, but the invested capital would be represented by the capital stock and surplus exclusive of the depreciation reserve. In the ordinary business enterprise, during the exhaustion of an asset, amounts are being earned which are represented by other assets which serve to take the place of the asset being exhausted. In this manner an amount at least equal to that originally paid in will be represented in the taxpayer's invested capital though, obviously, the asset originally paid in may have been completely exhausted and properly removed from his books. Often the imprudent business man will not provide for the exhaustion of his assets and will not make a charge against earnings for such exhaustion. In this manner the true earnings for a given year are overstated. Consequently, when dividends are paid out of these earnings which are in excess of the earnings after allowance for exhaustion, an impairment of capital originally paid in takes place and under the statute, invested capital must be reduced on account of this impairment.

In this case, the patents in question, exhaustible assets, were not entered upon petitioner's books, and if we grant petitioner's contention and allow their restoration, we must likewise make provision for their exhaustion, which, since the life of each patent had completely expired prior to 1919, would serve to offset the asset value restored. We have no evidence as to the earnings of the petitioner or its predecessor over the years when the patents were expiring other than that the letter from the respondent notifying the petitioner of the deficiency in question shows a surplus of $372,498.11 as at January 1, 1919, without making the restoration sought. We are likewise without information as to the extent to which dividends were paid over these years other than that a letter from the respondent to the petitioner which was introduced in evidence shows small dividend payments during 1917 and that the early record of Smith & Sayre Manufacturing Co. dividend declared in the first year of its existence.

In view of the foregoing, the Board is of the opinion that even if it should be held that the petitioner is a corporate continuation of Smith & Sayre Manufacturing Co. which was not affected by the transactions occurring in 1890 and 1903, a restoration to invested capital of patents the life of which had expired long prior to the year 1919 can not be permitted.

The second issue is whether petitioner is entitled to have restored and included in invested capital the cost of certain drawings previ-

ously charged to expense. Petitioner is engaged in the manufacture, sale and installation of gas apparatus, and as a part of such business makes drawings of the apparatus which it manufactures for sale and drawings showing the arrangement of this apparatus in plants where it is to be installed. It has on hand over 20,000 drawings, some of which were made during the existence of Smith & Sayre Manufacturing Co. With the exception of a small account, entered in the books at the time of the transfer of assets from Smith & Sayre Manufacturing Co. to petitioner and minor changes therein since that time, petitioner has followed the conservative accounting practice of charging the cost of producing these drawings to expense. At least from 1904 to 1917 the amount expended each year has been fairly uniform, and apparently throughout the life of the petitioner and its predecessor, expenditures of this nature have been made and charged to expense. No evidence was introduced with respect to the period during which these drawings would be useful to petitioner.

While the evidence establishes that in the aggregate, substantial amounts were expended in the production of these drawings and that they had a useful life extending beyond the year when produced, we are not convinced that the long consistent practice of the petitioner of charging these items to expense was erroneous. As we said in *Goodell-Pratt Co.*, 3 B. T. A. 30, the fact that an item was erroneously charged to expense in the first instance does not preclude a correction of this mistake at a later time, but it is often difficult to differentiate between capital and expense items in certain classes of expenditures. In the *American Seating Co.*, 4 B. T. A. 649, the Board said:

In the ordinary conduct of a manufacturing business the differentiation of capital expenditures and operating expense disbursements is largely a matter of sound discretion and experienced business judgment. The dividing line between the two classes can not be defined by statute and, so far as has come to our attention, no court has ever yet attempted to make a definition that can apply to any case except the one under review.

In that proceeding, expenditures for drawings, patterns, etc., which were made during a transition period of three years when the taxpayer was changing the character of its output, were allowed as capital charges. This, however, is not comparable to this case. Here we are dealing with a situation where the expenditures were not made within a short period, but represent a constantly recurring charge made each year in order to keep pace with the development of the industry in which petitioner is engaged. Changes are constantly being made, and while engineering work done in the designing of a piece of a particular apparatus may be useful in an improved item of the same type made many years later, the value of the first draw-

ing can hardly be said to be what it was before the improved type was made. As evidence that through the development of petitioner's business many changes have taken place the evidence shows that, whereas the petitioner or its predecessor were originally engaged in various lines of manufacture, many have been gradually abandoned so that it is now engaged almost exclusively in the gas industry. It is difficult to believe that this development of its business did not involve a corresponding abandonment in drawings made for a particular line.

Petitioner asks us to accept the proposition that the drawings made from 1904 to 1917 should be capitalized without furnishing any basis for their exhaustion, depreciation or obsolescence, and that their full cost should be restored to invested capital and there kept until such time as we know not when. Even if it were correct to reverse the long established practice of charging these items to expense, some basis should exist for eliminating items from the capital account when their useful life expires and as new or improved types are constructed to take their place. Certainly, if the capitalization theory contended for is sound, a concern with a business history of more than 50 years should be able to furnish a basis for exhaustion of these drawings which would prevent the building up of an account which neither good accounting practice would sanction, nor sound business policy approve. A similar situation was before the Board in the *Co-operative Foundry Co.*, 2 B. T. A. 888, wherein the following statements were made:

* * * No evidence was introduced as to the actual life of a pattern, a mold, a flask, or a fallow board. The taxpayer contents itself with the mere argument that these articles are the subject of constant replacement and repair, and are at all times kept in an efficient condition. Such an argument would apply equally to any other tangible property, no matter how ephemeral its life in the business. It would apply to the pencils of the stenographer as well as to her typewriter, although one is a well-recognized expense, and the other a capital asset. If the taxpayer had an actual capital asset with an appreciable life as it claims, and had records extending back to 1909 of the actual construction of such assets and their cost, it was in a position to set up records showing construction from year to year, to estimate the life of the molds, flasks, and fallow boards constructed, to depreciate them over that life, and to set up the replacements if any from time to time. The taxpayer has done none of these things, but asks the Board to accept a mere conclusion that these assets had a substantial life based on a mere argumentative claim that they are constantly replaced and kept in an efficient working condition. We consider that the evidence is insufficient to establish that the assets so claimed were of such a substantial character as to require capitalization in view of the consistent policy followed by the taxpayer both before and after 1917. * * *

In *Sneath Glass Co.*, 1 B. T. A. 736, the Board dealt with a situation fairly analogous to this case as follows:

The taxpayer contends that prior to 1917 it had expended $18,032.76 for the manufacture or purchase of molds and patterns, and that no part of this amount was included by the Commissioner in invested capital for the years 1917, 1918, and 1919. The evidence shows that some of these molds and patterns last from a day or two to five years; that the corporation has always charged to expense the cost of the manufacture or purchase of them; and that no capital account has ever been maintained in respect of them.

We are of the opinion that it was entirely proper for the taxpayer to charge these items as expenses when the molds and patterns were acquired. Conservative accounting would warrant such action. The Commissioner has never raised any question as to the correctness of such treatment. We are therefore of the opinion that the taxpayer is not entitled to include in invested capital any amount representing the estimated cost of the molds and patterns acquired in past years, and that it is not entitled to any deduction from gross income for the years 1917, 1918 and 1919, in respect of depreciation upon the estimated cost of them.

Montgomery, in his work on "Income Tax Procedure," 1927 Edition, p. 999, makes the following observations with respect to items such as we are here concerned with:

The difficulty which the accountant encounters in the proper valuation of such patterns as are successful is to persuade proprietors to accept valuations which are reasonably conservative. Where patterns are used for stock or regular output, their value depends upon their life and upon the probability of renewed use. Where they are acquired or made for special jobs, their residual value is small, and their life should be considered coextensive with the life of the jobs themselves. In every case items such as these should be looked upon with suspicion, and convincing proof must be adduced before placing any material sum on their account as an asset. An auditor often meets with strong opposition in his efforts to reduce these items to reasonable amounts, for they represent the skill and often the affections of the proprietors, who dislike to see their value depreciated on the books. But the public demand is fickle, and patterns must be made to suit the changing taste. Even what appear to be standard patterns for staple businesses often change rapidly. Engineers make almost as many alterations in their "styles" as do milliners. When the demand ceases most of the old patterns should be scrapped. This rule applies to hardware designs as well as to patterns for women's dresses.

While the *Webb Press Co., Ltd.*, 3 B. T. A. 247, on which petitioner places much reliance, contains language which tends to support its position, the fact that the restoration there sought was denied prevents its being complete authority for the principle contended for.

In view of the foregoing, the Board is unwilling to say that constantly recurring charges of the fairly uniform amounts here in question, which have been consistently charged to expense over a long period of years, should now be capitalized, particularly when we are without evidence as to a proper basis for the reduction of this account as the useful life of the drawings expires.

In view of our decision on the two preceding issues, it becomes unnecessary to pass on the third issue advanced with respect to the

effect on invested capital in 1919 of the erroneous taxes computed for 1917 and 1918 without the benefit of the restorations to invested capital hereinbefore considered.

In the petition the claim was made for a determination of profits tax under section 328 of the Revenue Act of 1918, as provided in section 327 of the same Act. All allegations with respect to this claim were denied by the respondent and no evidence was presented on account thereof. Likewise, no argument was advanced in petitioner's brief on this point. The petitioner's contention as to this issue is accordingly denied.

Reviewed by the Board.

*Judgment will be entered for the respondent.*